**In re XTI XONIX TECHNOLOGIES INC., Debtor.**

**Edward C. HOSTMANN, Trustee, Plaintiff,**

**v.**

**FIRST INTERSTATE BANK OF ORE-GON, N.A.; Thomas H. Peterson and Gloria Peterson, Defendants.**

**Bankruptcy No. 391–36468–S7. Adv. No. 92–3163–S.**

United States Bankruptcy Court, D. Oregon.

July 19, 1993.

Sanford R. Landress, Portland, OR, for plaintiff.

Catherine S. Travis, Robert J. Vanden Bos, Shawn P. Ryan, Peter G. Raphael Portland, OR, for defendants.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

The plaintiff trustee and the defendant, the First Interstate Bank of Oregon (hereinafter FIOR), have filed cross motions for partial summary judgment asking the court to decide whether the execution by Thomas Peterson and Gloria Peterson, insiders of the debtor, of a guarantee, which includes their waiver of certain rights, removes the attacked transfers from the one year time frame of 11 U.S.C. § 547(b)(4)(B)[1]. The position in which the parties find themselves is the result of the decision of the United States Court of Appeals for the Seventh Circuit, *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Const. Co.)*, 874 F.2d 1186 (7th Cir.1989), which established what has become commonly known as the "Deprizio doctrine." This doctrine has been adopted by the Oregon bankruptcy court. *See In re Ishaq*, 129 B.R. 206 (Bankr.D.Or.1991); *Official Unsecured Creditors' Committee of Sufolla, Inc. (In re Sufolla, Inc.)*, Adv. No.

---

**1.** All statutory references hereinafter are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, unless otherwise indicated.

89–3077, Case No. 388–02683–S11, slip op., 1990 WL 305574 (Bankr.D.Or. Oct. 2, 1990) (Perris, J.); *Morrow v. LaPrade (In re Latitudes Marine Towing & Salvage, Inc.)*, Adv. No. 88–0363–S, Case No. 388–00337–S7, slip op., 1988 WL 236559 (Bankr. D.Or. Dec. 23, 1988) (Sullivan, J.). In *Levit* the Seventh Circuit held that the preference recovery period for outside creditors is one year when the payment produces a benefit for an inside creditor, including a guarantor. After *Levit* the ever fruitful minds of attorneys set themselves the task of structuring financial undertakings for outside creditors which would avoid this legal juggernaut. This court now deals with a product of such undertaking.

The Petersons signed a guarantee of the debtor's obligations in favor of FIOR. The guarantee includes a paragraph 8 denominated "Subrogation and Waiver of Guarantor's Rights Against Debtor." The trustee asserts that when the Petersons signed the guarantee they did not waive all rights they had against the debtor because the language of paragraph 8 did not accomplish its intended purpose. In the alternative he asks the court to find the waiver provision void as against public policy.

The record reflects the parties agree on the following stipulated facts.

1. On July 8, 1964, the Articles of Incorporation of "Tom Peterson, Inc." ("Articles") were filed with the Corporation Division of the Secretary of State of Oregon ("secretary of State"). The Articles show that "Xonix international, Inc." ("Xonix") was a wholly owned subsidiary of Tom Peterson, Inc. from the date of incorporation until December 16, 1986.

2. On or about September 30, 1985, Tom Peterson, Inc. executed an Optional Advance Note in favor of FIOR to borrow up to $400,000 from FIOR.

3. On or about June 27, 1986, Tom Peterson, Inc. executed a Promissory Note in favor of FIOR in the amount of $275,000.

4. On or about July 16, 1986, the Petersons executed a Continuing Unconditional Guaranty under which they unconditionally guarantied any indebtedness owing from Tom Peterson, Inc. to FIOR in the maximum amount of $1,275,000.

5. On December 16, 1986, a Plan and Articles of Merger were filed with the Secretary of State whereby Xonix was merged into Tom Peterson, Inc.

6. On or about April 24, 1987, Tom Peterson, Inc. executed an Optional Advance Note in favor of FIOR to borrow up to $1,275,000.00 from FIOR.

7. In September or October, 1988, Tom Peterson, Inc. executed a Promissory Note in favor of FIOR to borrow $64,000 from FIOR.

8. On or about November 30, 1988, Tom Peterson, Inc. executed an Optional Advance Note in favor of FIOR to borrow up to $1,000,000 from FIOR.

9. On December 30, 1988, Tom Peterson, Inc. filed an Assumed Business Name Registration ("Name Registration") with the Secretary of State showing "Tom Peterson's" as the assumed business name of Tom Peterson, Inc.

10. On or about February 15, 1989, Tom Peterson, Inc. executed an Optional Advance Note in favor of FIOR to borrow up to $1,100,000 from FIOR.

11. On February 28, 1989, the total outstanding debt on all loans owing from Tom Peterson, Inc. to FIOR was $735,936.

12. On or about March 9, 1989, the Petersons executed a Continuing Unconditional Guaranty, guarantying the debts of Tom Peterson, Inc. to FIOR in an amount up to $3,000,000 from FIOR.

13. On or about March 17, 1989, Tom Peterson, Inc. executed a Promissory Note in favor of FIOR in the amount of $85,000.

14. On August 31, 1989, the total outstanding debt on all loans owing from Tom Peterson, Inc. to FIOR was $760,699.

15. On September 1, 1989, Tom Peterson, Inc. acquired Stereo Super Stores out of bankruptcy. The entire purchase was primarily accomplished with advances through flooring companies, plus Tom Peterson, Inc. utilized a $500,000 unsecured loan offered by West One Bank.

16. On or about September 15, 1989, Tom Peterson, Inc. executed an Optional Advance Note in favor of FIOR to borrow up to $2,500,000 from FIOR.

17. On or about September 15, 1989, the Petersons executed a Continuing Unconditional Guaranty, guarantying the debts of Tom Peterson, Inc. to FIOR in an amount up to $2,600,000.

18. On November 30, 1989, the total outstanding debt on all loans owing from Tom Peterson, Inc. to FIOR was $975,294.

19. On December 22, 1989, Tom Peterson, Inc. filed with the Secretary of State an Articles of Amendment changing its corporate name from "Tom Peterson, Inc.," to "XTI Xonix Technologies Incorporated" ("XTI"). Subsequently, XTI filed an Assumed Business Name Registration 1990 Application For Renewal for the name "Tom Peterson's," thereby continuing its exclusive right to use the assume business name of "Tom Peterson's."

20. On December 31, 1989, the total outstanding debt on all loans owing from XTI to FIOR was $1,216,694.

21. On or about January 16, 1990, XTI executed an Optional Advance Note in favor of FIOR to borrow up to $2,500,000 from FIOR.

22. On or about January 16, 1990, the Petersons executed a Continuing Unconditional Guaranty ("Guaranty") under which they unconditionally guaranteed any indebtedness owing from XTI to FIOR in the maximum amount of $3,000,000.

23. On January 31, 1990, the total outstanding debt on all loans owing from XTI to FIOR was $1,657,132.

24. On December 7, 1990, XTI granted FIOR a security interest (the "Security Interest") in all its tangible and intangible assets.

25. On December 12, 1990, FIOR perfected the Security Interest by filing a UCC Financing Statement.

26. On October 7, 1991, XTI filed a voluntary Chapter 11 petition. On February 19, 1992, the case was converted to a Chapter 7 liquidation.

27. Between October 17, 1990 and October 3, 1991, XTI made several payments to FIOR on account of its obligations to FIOR.

28. On April 16, 1992, FIOR sold 3,637 shares of Boeing stock owned by Gloria Peterson and 100 shares of Boeing stock owned by Tom Peterson for $171,454.53 and $4,714.13, respectively, and applied the proceeds of sale to the indebtedness owed by XTI to FIOR. These shares had been pledged by the Petersons to secure the Guaranty.

The provisions of the September 15, 1989 and January 16, 1990 Continuing Unconditional Guaranties executed by Petersons were identical except for what appears as paragraph 8 (and an additional paragraph 23 in the latter which is not relevant to the matter before the court). Paragraph 8 in the September 15, 1989 guarantee states:

8. Subordination of Guarantor's Rights Against Debtor. In the event of the payment by Guarantor to Bank of any amount whatsoever and the resultant subrogation of Guarantor to the rights of Bank by reason of such payment, the amount of the remaining Indebtedness of Debtor to Bank after the payment by Guarantor pursuant to this Guaranty shall have priority over any claim that Guarantor may have against Debtor, whether or not Debtor is at such time or thereafter becomes insolvent. Guarantor further expressly subordinates any claim against Debtor upon any account whatsoever to any claim that Bank may have against Debtor at any time and for any reason.

Paragraph 8 in the January 16, 1990 guarantee states:

8. Subordination and Waiver of Guarantor's Rights Against Debtor. Guarantor irrevocably waives, disclaims and relinquishes all claims against Debtor which Guarantor otherwise has or would have by virtue of having executed this Guaranty, specifically including but not limited to all rights of indemnity, contribution or exoneration. In the event of the payment by Guarantor to Bank of any

amount whatsoever and the resultant subrogation of Guarantor to the rights of Bank by reason of such payment, the amount of the remaining Indebtedness of Debtor to Bank after the payments by Guarantor pursuant to this Guaranty shall have priority over any claim that Guarantor may have against Debtor, whether or not Debtor is at such time or thereafter becomes insolvent. Guarantor further expressly subordinates any claim against Debtor upon any account whatsoever to any claim that Bank may have against Debtor at any time and for any reason.

## STANDING

In its memorandum in support of its motion for partial summary judgment FIOR argued that the trustee was without standing to attack the validity of the waiver. At oral argument the court ruled that the trustee, although not a party nor in privity to a party to the guarantee, had standing. The standing cases which FIOR cited in support of its position on this issue, with the exception of *In re Fastrans, Inc.*, 142 B.R. 241 (Bankr.E.D.Tenn.1992), are not on point. In *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct 1678, 32 L.Ed.2d 195 (1972), *Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988), and *Feltman v. Prudential Bache Securities*, 122 B.R. 466 (S.D.Fla. 1990), the trustee filed adversary proceedings against corporate defendants on behalf of individual creditors. Here the trustee has filed the proceeding against the defendants only under § 547, which he clearly has authority to do on behalf of the bankruptcy estate. He has argued against the effectiveness of the waiver only in reply to the waiver raised as an affirmative defense by FIOR. To deny the trustee standing to do this would be tantamount to denying him the right to pursue the § 547 claim against FIOR, something all parties agree he may do. This is because a deci-

sion on the effectiveness of the waiver provision will decide whether the trustee may pursue FIOR for the alleged preferential transfers. To the extent that the court ruled otherwise in *In re Fastrans, supra,* this court respectfully disagrees.

■ If the insider (here Petersons) is *not* a creditor of the debtor arising out of their execution of the guarantee [2] there can be no preferential transfer within the one year span as there will be no transfer "to or for the benefit of a creditor." [3] The trustee alleges that equitable rights may arise under either equitable principles of law or through contract terms. He asks the court to find that the language of the January 16, 1990 guarantee does not waive the Petersons' equitable rights of subrogation, indemnity, contribution and exoneration which arise by operation of law. Because the Petersons retain these rights they remain creditors of the debtor despite their execution of the waiver. FIOR claims that although the equitable rights of subrogation, indemnity, contribution and exoneration arise in equity, these rights are not separate from those addressed by paragraph 8 and they have been waived. It further argues that even assuming that the language of paragraph 8 does not waive the Petersons' right to subrogation, this right does not constitute a "claim" against the debtor; therefore as to that right the Petersons cannot be "creditors" of the debtor.

*Through the First Sentence the Petersons Effectively Waived Their Rights of Indemnity, Contribution and Exoneration*

■ For purposes of § 547 a "creditor," with some exceptions not relevant to our inquiry, is an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10). For pur-

---

**2.** The Petersons are creditors of the debtor arising out of transactions in which FIOR has no involvement. Under *Levit* the trustee must establish that the Petersons have a claim against the debtor arising from their obligations under

the guarantee and not just as creditors of the debtor generally.

**3.** Section 547(b)(1).

poses of the Bankruptcy Code a "claim" is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

11 U.S.C. § 101(5). Whether an entity holds a right which falls within the definition of a "claim" under § 101(5) is determined by state law. This court has found that the use of the term "right of subrogation" is used by courts rather carelessly to define generally the equitable bundle of rights a guarantor (or surety) holds which aids him in obtaining repayment. For purposes of this opinion it is important that this bundle of rights be separately examined. It consists of the rights of indemnity (or reimbursement), contribution, subrogation and exoneration. Under the right of indemnity the guarantor may demand repayment directly from his principal of the amount he has paid the creditor. Or upon maturity of the debt under his right of exoneration the guarantor may bring a suit against the principal to force him to pay the creditor. The guarantor has a right of contribution against any co-guarantors to force payment of their share of the principal's obligation to the creditor. Finally, the guarantor has a right of subrogation which permits him to be substituted to the position of the creditor whom he has paid. Oregon courts recognize these rights. *See generally Chada v. Tapp,* 277 Or. 3, 8–9, 558 P.2d 1225, 1227 (1977) (exoneration); *Reimann v. Hybertsen,* 275 Or. 235, 550 P.2d 436, *modified,* 276 Or. 95, 553 P.2d 1064 (1976) (subrogation; reimbursement); *Mansfield v. McReary,* 263 Or. 41, 501 P.2d 69 (1972) (contribution). These rights will be enforced by the court as a court of equity whether or not they are the subject of a specific contractual agreement between the parties. By contract the parties may modify or waive these rights. A waiver is effective in Oregon. *See W.J. Seufert Land Co. v. Greenfield,* 262 Or. 83, 496 P.2d 197 (1972). If these equitable rights are specifically recognized by the terms of a contract, to the extent that they are not waived or modified the contract terms are simply a reaffirmation of preexisting equitable rights.

Paragraph 8 in the January 16, 1990 guarantee states in part: "Guarantor irrevocably waives, disclaims and relinquishes all claims against Debtor which Guarantor otherwise has or would have *by virtue of having executed the Guaranty....*" (emphasis added). The trustee argues that the underlined words limit the guarantor's waiver to those claims against the debtor which arose only out of the contractual language of the guarantee. Ergo, the waiver does not cover claims arising under equitable principles. The problem with the trustee's argument is that he has not pointed out to this court any paragraph in the guarantee which expressly grants to the guarantors any of the bundle of rights with which we are dealing. Therefore, even if this court were to assume, which it does not, that these rights, if granted by contract, are somehow separate or apart from these rights as recognized in equity, this guarantee does not contain any language which specifically grants these rights to the guarantors. Because no such rights were expressly granted to the guarantors by the contract the trustee's interpretation of the clause would render it nugatory. It is well-established that a written contract must be read as a whole and every part interpreted with reference to the whole, and that effect must be given to reasonable interpretations of each phrase and clause. *Kennewick Irr. Dist. v. U.S.,* 880 F.2d 1018, 1032 (9th Cir. 1989). Therefore the quoted phrase of the guarantee must by interpreted to mean that the guarantors irrevocably waived any rights that would have arisen automatically and been enforceable in a court of equity as a result of their signing the guarantee. The court concludes that by execution of

the guarantee the Petersons waived all their rights of indemnity, contribution and exoneration.

### The Right of Subrogation Constitutes a Claim Within § 101(5)

When the parties argued their motions before this court I tentatively ruled that the Petersons' right of subrogation constitutes a claim within the meaning of § 101(5). This court confirms that ruling with the following analysis. The legislative history to § 101(10) (§ 101(9)(A) from 1977 through 1990) is of little help in determining whether the guarantor's right of subrogation creates a claim within the meaning of that section. It provides:

A guarantor of or surety for a claim against the debtor will also be a creditor, because he will hold a contingent claim against the debtor that will become fixed when he pays the creditor whose claim he has guaranteed or insured.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309–10 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 22 (1978); 1978 U.S.C.C.A.N. 5787, 5808, 6266–6267. In its comments the history makes no distinction among the various rights held by the guarantor. For example, it should be clear that the right of indemnity falls easily within the definition of "claim" in § 101(5) because it constitutes a right which the guarantor holds which runs directly against the debtor. On the other hand the right of subrogation is a right which the guarantor holds directly against the creditor. Whether this right constitutes a "claim" is a more difficult question.

Commentators agree with the following detailed description of the right of subrogation: Subrogation is an equitable assignment. It is based on general principles of justice and does not spring from contract although it may be confirmed or qualified by contract. Such a right does not become a cause of action until the debt of the principal is fully paid,

see *U.S. v. National Surety, Co.*, 254 U.S. 73, 41 S.Ct. 29, 65 L.Ed. 143 (1920), although the parties may expressly provide for *pro tanto* subrogation (subrogation to the extent of the amount paid by the surety[4]) whether or not the principal's debt is fully paid. Absent such expression a surety who pays only part of a debt which is still outstanding is not entitled to the right. The right entitles the surety to use any remedy against the principal which the creditor could have used. When the surety sues the principal by subrogation he is suing as an assignee of the creditor and not as a creditor himself. Whatever rights and priorities were possessed by the creditor pass to the surety. Equitable considerations limit the right. For example a court of equity may deny the surety this right if the surety is a volunteer or has been guilty of duress, fraud or illegality. *See* L. Simpson, *Handbook on the Law of Suretyship* § 47 at 209 (1950); *Restatement (First) of Security* § 141 cmt. a (1941); H. Arant, *Handbook of the Law of Suretyship and Guaranty* § 79 at 365 (1931). The one element of this right on which the commentators do *not* agree is when the right arises. Arant states that the surety's right of subrogation does not exist until the creditor's claim is fully paid.[5] On the other hand, Simpson states that the right comes into existence when the surety becomes obligated but the right does not become a cause of action until the debt is fully paid. Simpson, *Handbook on Law of Suretyship* § 47 at 212–13.

Oregon cases on this point seem contradictory. In *Schiska v. Schramm*, 151 Or. 647, 51 P.2d 668, 669 (1935), the court states that the right of subrogation arises when a contract of suretyship is executed. *Accord Hult v. Ebinger*, 222 Or. 169, 186–87, 352 P.2d 583, 591 (1960). On the other hand, there is language which suggests the contrary in *Mayer v. First Nat. Bank of Or.*, 260 Or. 119, 129, 489 P.2d 385, 390 (1971) ("rights ob-

---

**4.** Surety includes guarantor but is a broader term.

**5.** *See also In re Alexander Dispos–Haul Systems, Inc.*, 36 B.R. 612, 616 (Bankr.D.Or.1983) (*citing* Arant, *Handbook of the Law of Suretyship and Guaranty* § 79 at 357 (1931)).

tained by subrogation, especially when they are to be enforced against persons other than the principal debtor, are determined to exist only after a consideration of the facts of the case and the relative equities of the parties") and *Reimann v. Hybertsen*, 275 Or. at 238, 550 P.2d at 437 ("Plaintiff at the time of the granting of the judgment in the first case was not entitled to subrogation because he had not yet satisfied the judgment. Subsequent to the decision in that case he satisfied the judgment. Thus plaintiff is now asserting a claimed right [subrogation] which he acquired *subsequent* to the decision in the prior case and the adjudication in that case would not bind him."). It is clear in all the cited cases that the exercise of the right generally is conditioned upon the surety's payment of the amount he has agreed to pay, upon the payment of the principal's obligation in full and upon approval of its exercise by a court of equity. *See also Cooper v. Sagert*, 111 Or. 27, 34–35, 223 P. 943, 945 (1924). This is true whether the surety entered into a previous contract binding him to payment or whether the surety is a volunteer. This court finds that if a surety enters into a contract which binds him to make payment he has, upon execution of that contract, a right, equitable in nature, which he did not have previously. It is imperfect, partial, incomplete, not ripe, or, in legal parlance, inchoate. This right will not become complete or ripen into enjoyment until all the enumerated conditions have been met. The right of subrogation is a right the surety holds against the creditor. But if the conditions to the exercise of the right of subrogation are met the surety is free, in that exercise, to demand payment from the debtor.

The issue this court must determine is whether this right, as so described, falls within the definition of "claim" found in § 101(5). The Supreme Court has stated that Congress intended "to adopt the broadest available definition of 'claim'" un-

der § 101(5). *Johnson v. Home State Bank*, —— U.S. ——, ——, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991). "Right to payment" within the definition of "claim" means nothing more nor less than an enforceable obligation. Moreover, Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *In re Christian Life Center*, 821 F.2d 1370, 1375 (9th Cir.1987) (*quoting* S.Rep. No. 95–989, 95th Cong., 2d Sess. 21, 22, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5807, 5808). Although neither the Bankruptcy Code nor its legislative history contains a definition of "contingent" or "contingent claim", the Ninth Circuit cites with approval *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981), in which a claim was defined as contingent

> as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

*In re Dill*, 731 F.2d 629, 631 (9th Cir.1984). This court finds that the right of subrogation constitutes a right to payment which is a "claim" under § 101(5). Under the facts of this case this right to payment is equitable, unmatured, unliquidated and contingent.

### *Interpretation and Construction of Paragraph 8* [6]

██ The court, having found that the Petersons' right of subrogation constitutes a claim against the debtor within the meaning of § 101(5), must determine whether, by signing the January 16, 1990 guarantee, the Petersons effectively waived that right.

---

**6.** Interpretation and construction of written instruments are not the same. A rule of construction is one which either governs the effect of an ascertained intention, or points out what the court should do in the absence of express or

implied intention, while a rule of interpretation is one which governs the ascertainment of the meaning of the maker of the instrument. *In re Union Trust Co.*, 89 Misc. 69, 151 N.Y.S. 246, 249 (1915).

The trustee has cited *In re Helen Gallagher Enterprises, Inc.*, 126 B.R. 997 (Bankr.C.D.Ill.1991), in support of his position that the language of the Peterson guarantee does not waive their right of subrogation. FIOR has cited *In re Fastrans*, 142 B.R. 241 (Bankr.E.D.Tenn.1992), as precedent for their position that it does. The court does not believe that either case is of help in interpreting the Peterson waiver provisions. The waiver language in each of these cases is significantly distinguishable from the language before this court.

In *Gallagher* the relevant language consisted solely of the following: "The undersigned shall have no right of subrogation whatsoever with respect to the liabilities or the collateral unless or until the lender shall have received full payment of all liabilities." *Gallagher*, 126 B.R. at 1000. There is nothing in the quoted sentence which indicates that the guarantor intended to completely waive his right of subrogation. Indeed, that was not the issue before the court. The issue before the court, given this language, was when the guarantor's right of subrogation arose and whether it constituted a claim within § 101(5). Further, in *Gallagher* there was no language in the guarantee which waived the guarantor's other rights.

In *Fastrans* the waiver clause reads:

Each guarantor also hereby waives any claim, right or remedy which such guarantor may now have or hereafter acquire against the [debtor] ... that arises hereunder and/or from the performance by any guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Associates against the [debtor] ... or any security which Associates now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

*Fastrans*, 142 B.R. at 243. The *Fastrans* parties did not dispute that this language clearly and unambiguously waived all rights the guarantor, upon payment, had against any party. The *Fastrans* waiver language varies significantly from the language in the Peterson guarantee. It eliminates any argument about whether the rights arise independently from contract and equity by mentioning both. It contains no language giving the creditor priority over the guarantor's rights. The former is of little help in construing the latter.

Pursuant to paragraph 22 of the guarantee its construction is governed by Oregon law. O.R.S. 41.740, our parol evidence rule, states:

41.740 Parol evidence rule. When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term "agreement" includes deeds and wills as well as contracts between parties.

FIOR first asserts that O.R.S. 41.740 is inapplicable in circumstances involving a controversy between one of the parties to the contract and a stranger to the contract. Interestingly, the parties before the court agree that the language of paragraph 8 of the Peterson guarantee is unambiguous yet their interpretations of that paragraph are diametrically opposed. If I find that O.R.S. 41.740 is applicable under the circumstances of this case alternatively FIOR has offered certain parol evidence to explain its interpretation, taking the position that I may hear this evidence to determine whether the contract terms are unambiguous. The trustee disagrees, arguing parol evidence is inadmissible if contract terms are

unambiguous. Although entering into an April 9, 1993 stipulation of certain facts, he has objected, through a motion to strike, to other facts which appear in FIOR's statement of material facts filed in support of its motion for summary judgment.

In Oregon O.R.S. 41.740 is inapplicable to our facts. The statutory clause, "between the parties and their representatives or successors in interest ...", has been interpreted to limit the applicability of O.R.S. 41.740 to the described entities. *Bagley Co. v. Int'l Harvester Co. of America*, 99 Or. 519, 522, 195 P. 348, 349 (1921). In a dispute between a party to the document and a stranger the party may use parol evidence to explain or contradict its terms. *Robison v. Oregon–Wash. R. & Nav. Co.*, 90 Or. 490, 508, 176 P. 594, 600 (1919). This is true even where the contract is integrated and unambiguous. *Carolina Casualty Ins. Co. v. Oregon Auto Ins. Co.*, 242 Or. 407, 413, 408 P.2d 198, 201 (1965). Therefore under our facts the integration clause of the guarantee is inapplicable. Further, parol evidence may include evidence of conduct subsequent to the execution of the contract. *Edwards v. Wolf*, 278 Or. 255, 259, 563 P.2d 717, 719 (1977). In light of *Robison, Bagley* and their progeny the disagreement as to whether this court, in interpreting the contract, may review parol evidence, to determine if the paragraph is ambiguous is irrelevant. It is clear that *Bagley et al.* allow this court to take this evidence into consideration in reaching its findings and conclusions and it will do so.

### The Issues All May Be Decided on the Motions

A remaining issue is whether the court may consider the parol evidence within the context of the motions with supporting statement of facts or whether the parties are entitled to a prior evidentiary hearing. The paragraphs in FIOR's January 22, 1993 statement of facts which the trustee has moved to strike largely consist of statements made by either Tom Peterson or Lee Nusich (FIOR's in-house legal counsel) during their depositions, and made in the affidavit of Dennis Nye (FIOR's vice-president). The trustee did not provide any affidavits, statement of facts or deposition statements (other than the stipulated statement of facts) either to support his own motion for partial summary judgment or to oppose FIOR's motion. The stated bases for his objection to certain of the facts were that they were either irrelevant or, as showing subjective intent, immaterial in determining the objective intent of the parties through the contract terms themselves, *i.e.*, that under the parol evidence rule they were inadmissible. Further, in his memoranda in support of his motion and at oral argument the trustee, without supporting evidence, questioned the Petersons' credibility. He stated that it was in the Petersons' self interest to state that they had waived all their rights of indemnity, contribution, exoneration and subrogation through execution of the January 16, 1990 guarantee. The trustee's theory is as follows. In this suit the trustee, under § 547, is attacking the creation of a security interest from the debtor to FIOR within a year prior to bankruptcy as well as certain payments made by the debtor to FIOR on the note so secured. The security interest covers all the debtor's tangible and intangible assets. It is also attacking certain transfers made by the debtor to each of the Petersons within the year. All funds used to make the payments to FIOR and the Petersons were proceeds of FIOR's collateral. The trustee believes that if FIOR is successful in defending its security interest he will fail in his attempt to collect the payments the debtor made to the Petersons because of application of the collateral source rule. The collateral source rule provides that if the plaintiff receives some compensation for injuries from a source wholly independent of the defendant such payment should not be deducted from the damages which the plaintiff would otherwise collect from the defendant. In Oregon this rule has been applied to breach of contract cases as well as tort cases. *See Seibel v. Liberty Homes, Inc.*, 305 Or. 362, 752 P.2d 291 (1988). The trustee was not clear on the way in which he believed that this rule would operate within the context

of our facts. This court does not believe that it is applicable. It is clear, however, that if this court finds the trustee may not set aside the security interest that the debtor granted to FIOR that there may be no benefit to the estate for the trustee to pursue the payments the debtor made to the Petersons because the payments were made from FIOR's collateral. However, the court has concluded that the trustee had no basis for questioning the Petersons' credibility. In his complaint the trustee prays for $17,650 from Tom Peterson and $38,000 from Gloria Peterson. These are much smaller amounts than the Petersons potentially could claim against the debtor through their right of indemnity and of subrogation if the court were to find that their rights had not been waived. This is because certain of the Petersons' stocks were sold in partial satisfaction of the debtor's obligation to FIOR. Therefore it would appear to be in the Petersons' greater self interest to take the position that paragraph 8 of the January 16, 1990 guarantee had *not* waived their rights. Further, the trustee has not shown that he did not have the opportunity to challenge the Petersons' credibility during their depositions.

Local District Court Rule 220–10(a), incorporated into our local bankruptcy court rules by Local Bankruptcy Rule 7056–1, states:

A motion for summary judgment shall be accompanied by a supporting memorandum and separate concise statement detailing each material fact which the moving party contends:

(1) That there are no genuine issues to be tried;

*and*

(2) Which are essential for the court's determination of the issue or issues presented on summary judgment (not the entire case).

Subsection (b) states:

Opposition to a motion for summary judgment shall also include a separate concise statement that:

(1) Accepts the facts set forth in the moving party's concise statement; or

(2) Articulates opposition to the moving party's contention or interpretation of an alleged non-disputed material fact; or

(3) Articulates other relevant material facts which the responding party believes are at issue or are otherwise necessary for the court to determine the motion for summary judgment.

Subsection (f) states:

For purposes of a motion for summary judgment, material facts set forth in the concise statement of the moving party will be deemed admitted unless controverted by a separate concise statement of the opposing party.

Counsel for the trustee and FIOR generally followed the requirements of the local rule. For purposes of subsection (f) the trustee did not submit his separate statement of material facts; he simply articulated two legal bases for opposition to FIOR's statement of facts.

 The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party meets this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 25. The party which bears the evidentiary burden of a particular claim or defense must demonstrate that it has proved its case "by the quality and quantity of evidence required by the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All reasonable inferences from the evidence are drawn in favor of the non-moving party. *Id.* at 255. However, in order to survive a motion for summary judgment, the non-moving party ordinarily must furnish affidavits containing admissible evidence tending to show the existence of a genuine dispute of material fact. *Pelletier v. Federal Home Loan Bank of San Francisco,* 968 F.2d 865, 872 (9th Cir.1992), *citing Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

The court finds that the trustee's legal arguments in opposition to FIOR's statement of facts are without merit. I have reviewed the general nature of the statements. In light of *Bagley et al.* the statements are neither irrelevant nor immaterial. As the trustee has presented no statement of facts either in support of his motion for summary judgment or in opposition to FIOR's motion the court is in a position to accept the statements as true and decide the interpretation and construction of paragraph 8 of the guarantee on the motions without a further evidentiary hearing. Therefore the trustee's motion to strike is denied. (The court, having denied FIOR's motion to supplement record, has not considered the affidavit attached to that motion.)

There is ample evidence that both the Petersons and FIOR always intended that paragraph 8 constitute a complete waiver of all equitable rights of subrogation, indemnity, contribution and exoneration the Petersons would otherwise have had as guarantors. After the Deprizio doctrine was adopted in the Oregon Bankruptcy Court by Judge Sullivan in 1988, FIOR took steps to amend the waiver provision that appears in its form guarantee. FIOR's in-house legal counsel, Mr. Nusich, testified that the purpose of that revision was to assure that FIOR was protected from § 547 attacks arising out of application of the Deprizio doctrine. The first sentence of paragraph 8 was the product of the steps taken. It was simply *added to* the prior language of FIOR's form guarantee which appears in paragraph 8 now as the subsequent two sentences. It is this mixture of new and old guarantee language which has created disagreements about the paragraph's interpretation. Mr. and Mrs. Peterson periodically, prior to January 16, 1990, had executed guarantees for their corporation's loans from FIOR. They testified that prior to their signing the January 16, 1990 guarantee their own attorney explained the application of the

Deprizio doctrine to them and why, as a result, they were required to sign the new guarantee which would waive any and all rights they would otherwise have had as guarantors to seek repayment from others of amounts they, as guarantors, might have to pay on the debtor's obligation to FIOR. The Petersons secured their guarantee with certain property which FIOR later foreclosed upon. The Petersons filed a proof of claim against the debtor which did not include any amounts applied on the debt by FIOR from their property. This is some further proof of the Petersons' earlier intent to waive all their rights.

Neither party's attempt to interpret paragraph 8 within the four corners of the document is convincing. The trustee states that the first sentence waives only subrogation rights given by the contract while the second and third sentences retain the guarantors' equitable right of subrogation. In earlier discussion this court pointed out that there were no contract rights of subrogation granted through the language of the guarantee. The logic of the trustee's interpretation is thus destroyed. FIOR interprets the second and third sentences to be "merely" a subordination provision. FIOR has unfortunate myopia as to the use in the second sentence of the clause "the resultant subrogation."

Given the unrefuted evidence of the parties' intent the court finds that paragraph 8 of the January 16, 1990 guarantee waived all the Petersons' rights of subrogation that they otherwise would have had as guarantors.

### The Court Declines to Rule that Paragraph 8 is Contrary to Public Policy

██ Various commentators as well as Judge Easterbrook in *Levit* have enunciated numerous policy arguments that can be made in support of and in opposition to both the application of the language of § 547(b) and § 550(a) to facts such as these as well as the use of "anti-Deprizio" waivers.[7] Previously in adopting and applying

---

7. *See Levit,* 874 at 1198–1200; Peter A. Alces, *Rethinking Professor Westbrook's Two Thoughts*

the *Levit* holding in particular cases this court has voiced the position taken by the *Fastrans* court that "in the presence of several competing policy considerations this court will apply the letter of the statute to the facts before it." *Fastrans,* 142 B.R. at 246. For the same reason I decline to find that parties may not place "anti-Deprizio" waiver provisions in their contracts.

For the reasons stated the trustee's motion for partial summary judgment is denied; FIOR's motion for partial summary judgment is granted.

This memorandum opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 7052, which incorporates Rule 9014, they will not be separately stated.

## ORDER

This court having entered its Memorandum Opinion in the above-entitled proceedings on July 19, 1993, and based thereon

IT IS HEREBY ORDERED that the motion of trustee, Edward C. Hostmann, to strike the statement of material facts in support of defendant First Interstate Bank of Oregon, N.A.'s motion for partial summary judgment, filed January 22, 1993, is denied; and

IT IS FURTHER ORDERED that the motion for partial summary judgment filed by the trustee, Edward C. Hostmann, is denied; and

IT IS FURTHER ORDERED that the motion for partial summary judgment filed by First Interstate Bank of Oregon, N.A., is granted.

*About Insider Preferences,* 77 Minn.L.Rev. 605 (1993); Jay L. Westbrook, *Two Thoughts About Insider Preference,* 76 Minn.L.Rev. 73, 73 n. 2 (1991); Donald W. Baker, *Repayments of Loans*

*Guaranteed by Insiders as Avoidable Preferences in Bankruptcy: DEPRIZIO and Its Aftermath,* 23 U.C.C.L.J. 115 (1990).