**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE: ADAMSON APPAREL, INC., *Debtor*. | No. 12-57059 D.C. No. 2:11-cv-01204-VAP |
| ALBERTA P. STAHL, CHAPTER 7 TRUSTEE OF ADAMSON APPAREL, INC., *Appellant*, v. ARNOLD H. SIMON, *Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Virginia Phillips, District Judge, Presiding

Argued and Submitted
December 11, 2014—Pasadena, California

Filed May 6, 2015

Before: Ronald Lee Gilman,[*] Susan P. Graber,
and Consuelo M. Callahan, Circuit Judges.

---

[*] The Honorable Ronald Lee Gilman, Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

Opinion by Judge Gilman;
Dissent by Judge Graber

## SUMMARY[**]

### Bankruptcy

Affirming the district court's affirmance of the bankruptcy court's judgment after a bench trial in an adversary proceeding, the panel held that a corporate insider who personally guaranteed his corporation's loan is absolved of any preference liability to which he might otherwise have been subjected, where he had previously waived his indemnification rights against the corporation, he had a bona fide basis for doing so, and he took no subsequent actions to negate the economic impact of that waiver.

The panel held that the insider did not have any preference liability regarding a pre-petition payment of the loan because, in light of his indemnification waiver, he was not a creditor of the corporation, which was a chapter 7 debtor. The panel declined to follow a line of bankruptcy court cases holding that an insider guarantor is subject to preference liability where a transfer works to his benefit, even if he has unconditionally waived all claims against the debtor.

Dissenting, Judge Graber wrote that she would follow every bankruptcy court to have decided the issue and hold that insider-guarantors such as the insider here are creditors.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

She also wrote that, in deciding that the waiver was valid, the majority erred by making a finding regarding the purpose of a payment made by the insider and in relying on a statement made by counsel at oral argument.

## COUNSEL

James K.T. Hunter (argued) and Malhar S. Pagay, Pachulski Stang Ziehl & Jones LLP, Los Angeles, California, for Appellant.

Leslie A. Cohen (argued) and J'aime K. Williams, Leslie Cohen Law PC, Santa Monica, California, for Appellee.

## OPINION

GILMAN, Circuit Judge:

This case presents an unresolved issue of bankruptcy law. The question is whether a corporate insider who personally guaranteed his corporation's loan is absolved of any preference liability to which he might otherwise have been subjected, where he had previously waived his indemnification rights against the corporation, he had a bona fide basis for doing so, and he took no subsequent actions to negate the economic impact of that waiver. Bankruptcy courts have split on this issue, and neither party has been able to cite to any district- or appellate-court decision addressing the question.

Both the bankruptcy court and the district court below ruled in favor of the corporate insider.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The loan, pledges, and guaranties

Adamson Apparel, Inc. (Adamson) manufactures and sells clothing and accessories.  On April 18, 2002, Adamson took out a multimillion-dollar loan from CIT Group Commercial Services, Inc. (CIT).  To secure the loan, Adamson granted CIT a lien on its inventory and accounts receivable.  Arnold H. Simon, Adamson's president and CEO, subsequently entered into two separate agreements with CIT to guarantee the loan:  a Cash Collateral Pledge Agreement (the Pledge) and a Limited Guaranty (the Guaranty).  In these agreements, Simon took responsibility for Adamson's debt in the event that Adamson was unable to fully repay the loan.  Simon would ordinarily have been entitled to have Adamson reimburse him for any amount that he was obligated to pay on the corporation's behalf to settle the loan with CIT, but the agreements waived that right to indemnification. (As used throughout this opinion, Simon's right to "indemnification" encompasses his rights to subrogation, reimbursement, or any other form of repayment.)

Over the next 18 months, the Pledge and the Guaranty were revised several times.  Both agreements were initially signed on November 12, 2002.  The Guaranty was updated on February 11, 2003, then "amended and restated" on April 9, 2003.  Both documents were further "amended and restated" on April 25, 2003, then updated again on August 5, 2003.  A

letter dated December 2, 2003 increased the amount that had been guaranteed in the August 5, 2003 update of the Pledge.

Toward the end of 2003, an entity known as BP Clothing L.L.C. purchased a large amount of merchandise from Adamson.  On December 18, 2003, Adamson instructed BP Clothing to transfer the purchase price (specifically, $4,989,934.65) to CIT in partial satisfaction of the debt owed by Adamson to CIT, this being the very debt guaranteed by Simon.  Adamson filed for bankruptcy under Chapter 11 of the Bankruptcy Code nine months later.  On or about March 31, 2004, Simon paid the balance of the loan, totaling over $3.5 million, from his personal funds.

## B.  Lower-court proceedings

After Adamson filed for Chapter 11 bankruptcy in September 2004, the Committee of Unsecured Creditors (the Committee) was appointed to represent the interests of Adamson's unsecured creditors.  The Committee filed this adversary action against Simon under a preference-liability theory.  Preference liability is "a mechanism that allows [a] debtor or trustee to recover from creditors who received payments in the weeks or months prior to the bankruptcy so that they can be distributed to all bankruptcy estate creditors in accordance with their priority."  Leslie A. Cohen & J'aime K. Williams, *Guarantor Preference Liability*, 31 Cal. Bankr. J. 795, 795 (2011).  The Committee sought to recover from Simon the $4,989,934.65 paid by BP Clothing to CIT in December 2003, arguing that Simon was a corporate insider who received a preference because he had guaranteed the loan from CIT.  Any reduction in that debt was therefore to his benefit.

In June 2007, Simon filed a motion for summary judgment, contending that because he had waived his right to claim indemnification from Adamson, he was not a creditor and therefore not subject to preference liability.  The bankruptcy court granted that motion the following month.  It held that Simon had fully waived his right to indemnification, which eliminated his status as a creditor for preference-liability purposes.  The Committee appealed to the district court.

The district court reversed the grant of summary judgment and remanded the case to the bankruptcy court for further factual development.  It pointed out that an ambiguity existed between the Pledge and the Guaranty as to whether Simon had fully and irrevocably waived his right to indemnification.  The case was remanded to the bankruptcy court for a resolution of this issue.

A bench trial in bankruptcy court took place in September 2010.  At trial, Simon testified that he understood at all times that he would never have any right to seek indemnification from Adamson for any funds that he expended to settle its debt to CIT.  He told the court that CIT had required him to include the indemnification waiver in the Pledge and the Guaranty, although his own preference would have been to retain the right to seek reimbursement.  Simon also pointed out that he had never filed a proof of claim in Adamson's bankruptcy case.

In addition to Simon's testimony, the bankruptcy court took a plethora of documentary evidence under consideration.  The court entered its decision in favor of Simon in December 2010.  It held that the Committee had failed to carry its burden of establishing Simon's "creditor" status under

11 U.S.C. §§ 101(10) & 547(b). Simon's testimony as to his understanding of his rights under the Pledge and the Guaranty, together with his failure to file a proof of claim in Adamson's bankruptcy case, defeated the Committee's arguments based on the ambiguous wording of the documents. The bankruptcy court subsequently entered judgment in favor of Simon, holding that he was exempt from preference liability because he was not a creditor of Adamson.

The Committee again appealed to the district court, which affirmed the judgment of the bankruptcy court in August 2012. It held that the bankruptcy court did not commit clear error in concluding that the Committee had failed to establish that Simon was a creditor of Adamson. This timely appeal followed, with the duly appointed Trustee being substituted for the Committee after Adamson's bankruptcy case was converted from Chapter 11 to Chapter 7.

## II. ANALYSIS

### A. Standard of review

"We review de novo the district court's decision on appeal from the bankruptcy court, applying the same standards applied by the district court, without deference to the district court." *In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012) (citation omitted). The bankruptcy court's findings of fact are reviewed under the clear-error standard, and its conclusions of law are reviewed de novo. *Id.* The parties agree that New York state law governs the substance of this case in accordance with the choice-of-law provisions in the contracts at issue.

## B.  Simon's status as an alleged creditor of Adamson

Title 11 U.S.C. § 547(b)(1) requires that the transfer of assets in question must be "to or for the benefit of a creditor" in order for preference liability to attach.  In relevant part, a creditor is defined in § 101(10) of the Bankruptcy Code as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10).  A claim is further defined as a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11. U.S.C. § 101(5).  The Trustee bears the burden of establishing that Simon meets this definition, as well as satisfying each of the other preference-liability requirements, in order to prevail on its claim against him.  11 U.S.C. § 547(g); *see also Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp.*, 463 F.3d 1064, 1070 (9th Cir. 2006).

### 1.  *The contracts at issue are ambiguous as to whether Simon waived his indemnification right*

In support of its argument that Simon retains a claim against Adamson, the Trustee points to the Pledge documents dated November 12, 2002 and April 25, 2003. These documents provide that Simon "defers all statutory, contractual, common law, equitable, and all other claims against [Adamson]," including those for "subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse," "[u]nless and until [CIT has] received final payment and satisfaction in full" for the loan. The Trustee argues that simply deferring a claim does not extinguish it, so that Simon retains a claim against Adamson and is properly considered a creditor.  It contends that these

Pledge documents were never superseded by any subsequent document.

To counter this argument, Simon points out that his November 12, 2002 Guaranty states that he "irrevocably waives and agrees he will not exercise any and all rights which he has or may have at any time . . . to assert any claim against Adamson or any other party on account of payments made under this Guaranty or otherwise, including . . . any and all existing and future rights of subrogation, reimbursement, exoneration, contribution, and/or indemnity." That Guaranty was executed on the same date as the November 12, 2002 Pledge.

As for the documents dated April 25, 2003, they do not contain a clear waiver of the right of indemnification, but do confirm that the amendment and reinstatement "shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish or constitute a novation in respect of, the indebtedness and other obligations and liabilities of Pledgor evidenced by or arising under the Existing Guaranty." The April 9, 2003 version of the Guaranty was in place at the time that the Pledge was amended on April 25, 2003 and contains an indemnification waiver identical to the one in the original November 12, 2002 Guaranty. An identical waiver also appears in the August 5, 2003 update to the Pledge.

This discrepancy between the deferral of indemnification rights in the Pledge and the unconditional waiver of the same rights in the Guaranty creates an ambiguity on the face of the documents. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (*citing W.W.W.*

*Assocs. v. Giancontieri*, 566 N.E.2d 639, 641–42 (N.Y. 1990)). "The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (internal quotation marks omitted). Where multiple documents exist in support of the same transaction or purpose, the documents should generally be interpreted as a single contract. *BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 493 N.Y.S.2d 1, 3 (N.Y. App. Div. 1985). "Whether an agreement is ambiguous is a question of law for the courts." *Kass*, 696 N.E.2d at 180 (*citing Van Wagner Adver. Corp. v. S&M Enters.*, 492 N.E.2d 756, 758 (N.Y. 1986)).

Here, the district court properly concluded that the discrepancy discussed above creates an ambiguity as to whether Simon's right to indemnification was fully waived. One set of documents says that the right is simply deferred until CIT has been fully paid, while the other set of documents says that the waiver is unconditional. Because these two positions are inconsistent, we find no error in the district court's remand of the case to the bankruptcy court to resolve the ambiguity.

## 2. The bankruptcy court did not commit clear error in finding that the waiver of Simon's indemnification rights was unconditional

When a contract is deemed ambiguous, its interpretation becomes a question of fact, *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994), and we review that interpretation under the clear-error standard, *Dist. Lodge*

*26, Int'l Ass'n of Machinists & Aerospace Workers*, *AFL-CIO v. United Techs. Corp*., 610 F.3d 44, 54 (2d Cir. 2010). Clear error exists when, although there is evidence to support the lower court's conclusion, the reviewing court is left with the "definite and firm conviction that a mistake has been made." *ASM Capital, LP v. Ames Dep't. Stores, Inc. (In re Ames Dep't Stores, Inc*.), 582 F.3d 422, 426 (2d Cir. 2009) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

The district court was not left with such a conviction, nor are we. In addition to seeing the unconditional waiver set forth in the Guaranty, the bankruptcy court heard Simon's testimony that CIT had insisted on the waiver and that Simon had never questioned its effectiveness. This testimony was reinforced by the fact that Simon never filed a proof of claim in the Adamson bankruptcy case. The bankruptcy court thus had more than sufficient evidence to conclude that Simon had fully waived his right of indemnification from Adamson.

> **3.  Having fully waived his right of indemnification and taken no subsequent actions that would negate the economic impact of that waiver, Simon has no claim against Adamson and thus cannot be considered a creditor**

The Trustee offers no additional theory regarding any claim that Simon might have against Adamson that would cause Simon to meet the definition of a creditor as set forth in the Bankruptcy Code. Instead, it urges this court to join several bankruptcy courts in stepping away from the plain text of the Code and subjecting an insider guarantor to preference liability where a transfer works to his benefit, even if he has unconditionally waived all claims against the debtor. *See Miller v. Greystone Bus. Credit II, L.L.C. (In re USA*

*Detergents, Inc.)*, 418 B.R. 533, 541–42 (Bankr. D. Del. 2009); *Russell v. Jones (In re Pro Page Partners, LLC)*, 292 B.R. 622, 631–33 (Bankr. E.D. Tenn. 2003); *Telesphere Liquidating Trust v. Galesi (In re Telesphere Commc'ns, Inc.)*, 229 B.R. 173, 176 n.3  (Bankr. N.D. Ill. 1999).

The above line of cases relied upon by the Trustee stems from the Seventh Circuit's decision in *Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio)*, 874 F.2d 1186, 1194 (7th Cir. 1989), and Congress's subsequent response to *Deprizio* in 1994.  In principle, the Bankruptcy Code seeks to effect an equitable distribution of a debtor's assets to the debtor's various creditors through the Code's statutory provisions and the use of a bankruptcy trustee.  A simple way to achieve that goal in many situations is to collect all of a debtor's assets at the time of bankruptcy and apportion those assets ratably to the creditors according to their priority.  But Congress has recognized that such a simple scheme would not be equitable if creditors who sensed financial difficulty could demand payment and have their demands fully satisfied in the period leading up to the filing of a bankruptcy petition, leaving the remaining creditors with a shortfall.  *See id.* (describing this reasoning in more detail).

To remedy that concern, Congress empowered the trustee to set aside any transactions benefiting a creditor in the 90 days before the filing of a bankruptcy petition.  *See* 11 U.S.C. § 547(b).  Congress apparently decided that 90 days is an adequate time for reasonably alert creditors to notice potential preferential treatment and force a debtor to either pay up or face an involuntary bankruptcy petition.

But, as courts have noted and Congress has recognized, "[i]nsiders pose special problems."  *In re Deprizio*, 874 F.2d

at 1195. The Bankruptcy Code defines insiders of a corporation as any director, officer, general partner, or person in control of the corporation, as well as any of their relatives. *See* 11 U.S.C. § 101(31)(B). The court in *Deprizio* highlighted the particular complications that they cause as follows:

> Insiders will be the first to recognize that the firm is in a downward spiral. If insiders and outsiders had the same preference-recovery period, insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed.

*In re Deprizio*, 874 F.2d at 1195.

Congress responded to that concern by extending the preference-recovery period to *one year* for transactions that benefit insiders, where the insider is a creditor. The Bankruptcy Code implements this policy through 11 U.S.C. § 547(b):

> Except [for certain exceptions not relevant here], the trustee may avoid any transfer of an interest of the debtor in property (1) to or for the benefit of a creditor; [and] . . . (4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider[.]

For ordinary transactions, that provision is straightforward. But what happens when a lender makes a loan to the debtor and, as part of the loan, an insider personally guarantees the loan? May the trustee avoid payments made to the lender during the extended preference-recovery period? The Seventh Circuit in *Deprizio* held that, by the plain text of the Bankruptcy Code, the answer is "yes" —the longer preference-recovery period applies to those payments. *See In re Deprizio*, 874 F.2d at 1200–01.

In so holding, the Seventh Circuit reasoned that "[a] guarantor has a contingent right to payment from the debtor: if Lender collects from Guarantor, Guarantor succeeds to Lender's entitlements and can collect from Firm. So Guarantor is a 'creditor' in Firm's bankruptcy." *Id.* at 1190. Accordingly, the requirements of § 547(b) are met and the longer preference-recovery period of one year applies to payments on loans guaranteed by insiders. Other circuit courts, including this one, soon adopted the Seventh Circuit's analysis in *Deprizio*. *See, e.g.*, *Official Unsecured Creditors Comm. of Sufolla, Inc. v. U.S. Nat'l Bank of Or. (In re Sufolla, Inc.)*, 2 F.3d 977, 986 (9th Cir. 1993).

Congress remedied the perceived inequity to innocent lenders ensnared by *Deprizio* and its progeny in a 1994 amendment to the Bankruptcy Code. Under that amendment, which is still in effect, the extended recovery period applies to payments made on loans guaranteed by insiders, but the trustee may seek recovery only from the insider and not from the lender. 11 U.S.C. § 550(c).

Two separate lines of cases developed in *Deprizio*'s wake; one is relied upon by the Trustee and the other by Simon. The caselaw favorable to Simon developed first, after

*Deprizio* was handed down but before the 1994 amendment to the Bankruptcy Code. Those cases conclude that bona fide indemnification waivers are valid and excuse an insider guarantor from preference liability. *See O'Neil v. Orix Credit Alliance, Inc.* (*In re Ne. Contracting Co.*), 187 B.R. 420, 423–24 (Bankr. D. Conn. 1995); *Hostmann v. First Interstate Bank of Or., N.A. (In re XTI Xonix Techs. Inc.)*, 156 B.R. 821, 833–34 (Bankr. D. Or. 1993); *Hendon v. Assocs. Commercial Corp. (In re Fastrans)*, 142 B.R. 241, 245 (Bankr. E.D. Tenn. 1992). They "apply the letter of the statute to the facts before [them]" rather than focusing on broader concerns of public policy. *In re Fastrans*, 142 B.R. at 246; *see also In re Ne. Contracting Co.*, 187 B.R. at 423; *In re XTI Xonix Techs. Inc.*, 156 B.R. at 833–34. Because a guarantor has no legally cognizable claim against the borrower's estate once he has waived his right to indemnification, these courts concluded that insider guarantors who had done so in good faith were not "creditors" under the Bankruptcy Code and therefore were not subject to preference liability.

The cases relied upon by the Trustee, on the other hand, conclude that such waivers are simply not valid. *See In re USA Detergents, Inc.*, 418 B.R. 533, 542 (Bankr. D. Del. 2009); *In re Pro Page Partners, LLC*, 292 B.R. 622, 631 (Bankr. E.D. Tenn. 2003); *In re Telesphere Commc'ns, Inc.*, 229 B.R. 173, 176 n.3 (Bankr. N.D. Ill. 1999). As explained by the court in *Telesphere*,

> such a waiver has no economic impact—if the principal debtor pays the note, the insider guarantor would escape preference liability, but if the principal debtor does not pay the note, the insider could still obtain a claim against the debtor, simply by purchasing the

> lender's note rather than paying on the guarantee. Thus, the "Deprizio waiver" could only be seen as an effort to eliminate, by contract, a provision of the Bankruptcy Code. The attempted waiver of subordination rights was thus held to be a sham provision, unenforceable as a matter of public policy.

*In re Telesphere*, 229 B.R. at 176 n.3. The subsequent cases of *In re Pro Page Partners*, 292 B.R. at 631, and *In re USA Detergents*, 418 B.R. at 542, adopted *Telesphere*'s reasoning. Despite this split of authority in the bankruptcy courts, no district or circuit court has yet weighed in on the validity of these so-called "*Deprizio* waivers."

We begin our assessment by noting that the latter cases' concern about the possibility of "sham" waivers is a valid one. A savvy insider guarantor might well agree to waive his right to indemnification from the corporate debtor, but then simply purchase the debt from the lender rather than pay it off if the debtor is later unable to meet its obligations. Such maneuvering would transform the original guarantor into the lender directly rather than by way of subrogation and, in that capacity, he would clearly have a claim against the debtor's bankruptcy estate without the burden of the one-year preference period for insider guarantors.

But the mere possibility of such avoidance does not mean that it will routinely occur. The post-1994 bankruptcy courts that have considered this question, as well as our dissenting colleague, would establish a bright-line rule based on a fear of what *could* happen. We believe the sounder approach is to consider what actually *has* happened. Rather than negating every *Deprizio* waiver based on a hypothetical scenario, the

courts should instead examine the totality of the facts before them for evidence of "sham" conduct in the circumstances presented. In the present case, all evidence in the record indicates that the waiver at issue was not a sham.

First, CIT held a lien on Adamson's inventory and accounts receivable to secure the loan. This lien gave CIT a priority claim against these assets of Adamson in the event of bankruptcy. CIT's claim would therefore have been satisfied to the extent of the remaining inventory and accounts receivable even in the absence of Simon's guarantee.

Second, Simon never filed a proof of claim in the bankruptcy case. Counsel for both sides acknowledged at oral argument that the funds at issue here were not sufficient to cover Adamson's entire debt to CIT, and that Simon personally paid CIT over $3.5 million to clear Adamson's debt without ever seeking reimbursement. If the concern raised by the post-1994 bankruptcy cases were at play here, Simon would have simply purchased the balance of the CIT note and then filed a claim as the successor to CIT in the bankruptcy case. Instead, he personally paid the debt without ever filing a claim against the estate.

Our dissenting colleague, however, is not persuaded that the balance of Adamson's debt to CIT was paid from Simon's funds because that question was a contested fact in the original trial. But as discussed in more detail in the dissent, the Trustee's counsel acknowledged at oral argument that Adamson's debt to CIT—the debt against which the December 18, 2003 payment from BP Clothing was credited—was "fully paid off on March 31st [2004] . . . when it got the amounts from the cash collateral accounts." And

the record makes clear that the cash collateral accounts in question indisputably belonged to Simon.

We have every right to treat this concession at oral argument as binding on the Trustee. *See Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004) ("A party (or . . . a nonparty) is bound by concessions made in its brief or at oral argument."). Out of an abundance of caution, however, we gave the Trustee an opportunity in supplemental briefing to explain her counsel's statement and to clarify the Trustee's position on when Adamson's debt was paid off. But the Trustee failed to directly address the concession in her response, instead contending that her counsel's review "had revealed that the record below does not definitively establish either when or from what source the Adamson Apparel debt to CIT was satisfied." Despite this somewhat dubious claim of ambiguity, we note that the Trustee does not dispute the key fact that the Adamson debt to CIT has been fully paid without Simon filing a claim against the bankruptcy estate. This adds to our confidence that the concession made at oral argument was not simply a "slip of the tongue."

And contrary to the characterization of the evidence presented in the dissent, the Committee at trial did *not* argue that the $3.5 million payment made on March 31, 2004 was for a personal debt that Simon owed to CIT. It instead contended that Simon made the $3.5 million payment in connection with what the Committee called the "Grupo" transaction rather than with the transaction at issue in this case.

As made clear from the record below, however, Grupo Xtra of New York, Inc. was a company that had previously licensed trademarks that were eventually relicensed to

Adamson Apparel. Before going bankrupt, Grupo had incurred liabilities to CIT in connection with these trademarks. In early November 2002, CIT asked Adamson to assume the liabilities and try to collect Grupo's receivables. The Grupo transaction was thus simply a subset of Adamson's indebtedness to CIT. In short, the $3.5 million that Simon paid to CIT on March 31, 2004 was for Adamson's benefit, yet Simon never sought reimbursement for any portion of that payment in bankruptcy.

A third factor indicating that the waiver here was not a sham is the fact that Simon had no unilateral right to purchase the note from CIT if Adamson defaulted. Although he could have pursued that possibility, CIT was also free to refuse to sell him the note and instead insist on payment. This factor might explain why Simon did not, in fact, purchase the note rather than pay it off when called upon to do so. If Simon had had a contractual right to purchase the note from CIT, then we would be more concerned about the waiver being a sham.

Finally, the Trustee presented no evidence that the debt in question was the only debt that Simon guaranteed on Adamson's behalf. Adamson is a closely held corporation, and Simon is its president and CEO. There is no reason to assume that he did not personally guarantee additional Adamson debts that he has been called upon to satisfy. Under such circumstances, Simon would have received no benefit by satisfying CIT's debt first rather than any other debts of equivalent magnitude that he might have personally guaranteed. The Trustee's failure (or inability) to establish that the CIT loan was the only one personally guaranteed by Simon further lessens our concern about the bona fide nature of the waiver.

All of these factors lead us to the conclusion that the waiver at issue in this case was not a sham. The concern of the *Telesphere* line of bankruptcy cases is simply not present where Simon's waiver prevented him from filing a claim to recover the amount that he personally paid to satisfy the balance of Adamson's debt to CIT. We cannot say that a waiver totally eliminating Simon's right to recover over $3.5 million has no economic substance. Given that the waiver is valid, Simon does not have a claim against the Adamson estate and thus does not meet the definition of a creditor under the Bankruptcy Code.

Moreover, when faced with a clearly drafted statute, we are not at liberty to deviate from the text in favor of a generalized notion of public policy. The Supreme Court decided in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988), that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." In order to be subject to preference liability, a person or an entity must be a creditor. 11 U.S.C. § 547(b). A person is a creditor only if he has a right to payment from the debtor. 11 U.S.C. § 101(10). Here, Simon waived any such right at the insistence of CIT. Nothing in the Bankruptcy Code prevented him from doing so, nor does any portion of the Code subject Simon to preference liability simply because he received a benefit—and a contingent one at that—from the payment by BP Clothing to CIT. *See In re Deprizio*, 874 F.2d at 1190–92 (holding that corporate insiders were not "creditors" subject to a preference claim when the corporation paid the Internal Revenue Service for delinquent wage withholding taxes, despite the benefit that they received by being relieved of personal liability for the taxes).

The public-policy concern raised by the Trustee in this case is far from frivolous, but that concern is more properly addressed to Congress, which has the ability to amend the Bankruptcy Code. This court's equitable powers are limited by the text of the Code as presently worded. *Norwest*, 485 U.S. at 206. Accordingly, we hold that when an insider guarantor has a bona fide basis to waive his indemnification rights against the debtor in bankruptcy and takes no subsequent actions that would negate the economic impact of that waiver, he is absolved of any preference liability to which he might otherwise have been subjected.

## III.  CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.

GRABER, Circuit Judge, dissenting:

I respectfully dissent. The majority's conclusion that Arnold Simon is not a "creditor" for purposes of the Bankruptcy Code is wrong for two independent reasons. First, I would follow every bankruptcy court to have decided the issue and hold that insider-guarantors such as Simon are "creditors." The majority errs by looking to extraneous facts to decide whether the waiver is valid. Second, even if we were to look to additional facts, the majority's analysis depends heavily on a "fact" that the bankruptcy court expressly declined to find.

A. *Insiders and the Right to Indemnity*

As its president and CEO, Simon is an insider of Adamson Apparel, Inc.  Adamson took out a loan from CIT Group Commercial Services, Inc.  Simon personally guaranteed the loan.  Adamson made a partial payment of about $5 million on the loan in December 2003.  In September 2004, Adamson filed for bankruptcy.

Title 11 U.S.C. § 547(b) authorizes the bankruptcy trustee to avoid certain pre-filing transfers:  all transfers made in the 90-day period before filing and all transfers made for the benefit of a "creditor" in the one-year period before filing.  Because the December 2003 partial payment occurred less than a year before filing but more than 90 days before filing, the trustee's ability to avoid the transfer turns on whether Simon was a "creditor" of Adamson in December 2003.

Every bankruptcy court to have addressed this issue since the important 1994 amendments to the Bankruptcy Code have agreed:  insider-guarantors such as Simon are "creditors" for purposes of the Code even if they nominally have waived their right to indemnity. *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 542 (Bankr. D. Del. 2009); *Russell v. Jones (In re Pro Page Partners, LLC)*, 292 B.R. 622, 630–31 (Bankr. E.D. Tenn. 2003); *Telesphere Liquidating Trust v. Galesi (In re Telesphere Commc'ns, Inc.)*, 229 B.R. 173, 176 n.3 (Bankr. N.D. Ill. 1999).[1]  The courts' reasoning is important:

---

[1] The bankruptcy courts that decided the issue *before the 1994 amendments* all addressed the inequitable situation that Congress fixed in 1994—allowing a trustee to seek the funds *from the lender*.  As the

> [S]uch a waiver has no economic impact—if the principal debtor pays the note, the insider guarantor would escape preference liability, but if the principal debtor does not pay the note, the insider could still obtain a claim against the debtor, simply by purchasing the lender's note rather than paying on the guarantee. Thus, the [waiver] could only be seen as an effort to eliminate, by contract, a provision of the Bankruptcy Code. The attempted waiver of subordination rights was thus held to be a sham provision, unenforceable as a matter of public policy.

*Telesphere*, 229 B.R. at 177 n.3; *see USA Detergents*, 418 B.R. at 542 (quoting and agreeing with that text from *Telesphere*); *Pro Page*, 292 B.R. at 630–31 (same).

The majority opinion generally agrees with the quoted analysis. But the majority opinion then goes a step further—looking at additional facts in an open-ended inquiry into whether the waiver was a "sham." Maj. op. at 11–21. I disagree with that approach, which is not supported by precedent or by the logic of what Congress tried to accomplish. The waivers are invalid for purposes of the Bankruptcy Code because they attempt to defeat the one-year look-back period via contract, even though the waivers have no real-world economic impact. The majority opinion searches for clues as to whether Simon actually planned to purchase the note, but that inquiry is irrelevant. Because Simon easily *could have* purchased the note as of December

---

majority correctly recognizes, those cases plainly do not apply here, where the trustee seeks the funds *from the insider*.

2003, the waiver had no real-world effect other than to defeat the Bankruptcy Code's longer look-back period for insiders. Therefore, Simon was a creditor.

I would follow the unanimous view of the bankruptcy courts that have ruled on this issue and would hold that an insider-guarantor is a "creditor" for purposes of the Bankruptcy Code.

## B.  *Reliance on a New Fact*

The majority opinion's primary reasoning is that, because Simon later paid $3.5 million toward the Adamson-CIT loan with his personal funds and did not file a bankruptcy claim against Adamson, we should be less worried that Simon's waiver of indemnification rights was a sham.  As explained above, I disagree as a matter of law that those facts are relevant.  But even if we must consider additional facts, the majority opinion errs by considering a "fact" that the bankruptcy court expressly declined to find.

No one disputes that, in March 2004, Simon paid CIT about $3.5 million.  But the reason for that payment was hotly disputed before the bankruptcy court.  Simon asserted that the payment was in satisfaction of the Adamson-CIT loan. Plaintiff strongly disagreed and presented evidence that the payment was to satisfy a *personal* debt, owed by Simon to CIT, that had nothing whatsoever to do with Adamson.  For our purposes, if the $3.5 million payment was made only to satisfy a personal debt, then that payment does not demonstrate anything with respect to whether the waiver on the Adamson-CIT loan was a "sham."

Everyone agrees that the bankruptcy court declined to reach this factual question. In effect, the majority decides a disputed issue of fact. But "[t]rial courts find facts. We do not." *Fisher v. Roe*, 263 F.3d 906, 912 (9th Cir. 2001), *overruled in other part by Payton v. Woodford*, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003) (en banc).

Making that factual finding is all the more egregious because the record strongly (if not conclusively) suggests that the $3.5 million payment was *not* on Adamson's behalf but was for a personal debt that Simon had acquired with respect to a different transaction and company (Grupo). In Simon's favor is Simon's own self-serving testimony. In Plaintiff's favor is proffered evidence that included:

> • Financial statements by CIT in early 2004 showing (1) that no credit of $3.5 million appeared and (2) that, as of March 15, 2004—before the $3.5 million payment— Adamson owed CIT less than $200,000.

> • A separate note, which nowhere references Adamson and is a personal note: "FOR VALUE RECEIVED, ARNOLD H. SIMON, an individual (the "Debtor"), hereby unconditionally promises to pay on demand to the order of THE CIT GROUP . . . $3,379,630.00 . . . ."

> • A letter dated January 7, 2003, that describes the loan to Simon as "your personal loan from CIT."

• A letter from CIT that describes the loan as "the personal note to us dated November 5, 2002 with an approximate amount of $3[.]455 M," which included interest on the principal amount.

• A draft settlement agreement in late 2004 that states: "On or about November 5, 2002, CIT made a personal loan to Simon in the amount of $3,379,630 for which Simon executed a Demand Promissory Note . . . in favor of CIT in said amount."

• An email in late 2004 that describes the loan in similar terms.

The majority opinion attempts to justify its appellate factual finding in two ways. First, it asserts that, because the personal debt arose as part of the "Grupo transaction," and because Adamson assumed some of Grupo's liabilities, "[t]he Grupo transaction was thus simply a subset of Adamson's indebtedness to CIT." Maj. op. at 19. The bankruptcy court never made factual findings on these points, so the majority opinion attempts to justify one improper factual finding by making others. Moreover, whether Adamson assumed certain liabilities to CIT is wholly irrelevant to the question of the nature of the debt between Simon and CIT. As noted above and as evidenced by the note itself and by other documents from 2002 and 2003, the debt in question was a *personal* one, owed by Simon in his individual capacity. Accordingly, when Simon paid that personal debt, it was for his own benefit, not Adamson's.

Second, the majority opinion asserts that Plaintiff's lawyer "acknowledged at oral argument that . . . Simon personally paid CIT over $3.5 million to clear Adamson's debt." Maj. op. at 17. Such an acknowledgment would be a startling concession given that the issue was disputed vigorously before the bankruptcy court. Unfortunately for the majority opinion, the transcript of oral argument reveals no such concession.

After oral argument, we ordered supplemental briefing on the effect of the following exchange:

> JUDGE GILMAN: I've just got one question. I want to know, was the debt to CIT fully paid off on December 18, 2003, when the BP Clothing amount was roughly five million was in fact diverted to . . .

> ATTORNEY HUNTER: No, I think it was fully paid off on March 31st when it took the . . . uh . . . March 2004, when it got the amounts from the cash collateral accounts.

That statement cannot be considered a concession on the question of the reason for the March 2004 payment. Judge Gilman asked whether the debt was fully paid in December 2003, and the lawyer answered "no." In context, the question concerned *timing*, not the reason for the 2004 payment. Moreover, the lawyer stated only that "I *think*" that the debt was satisfied by the March 2004 payment. (Emphasis added.) In the supplemental briefing, the lawyer explained that, after reviewing the record, his statement at oral argument had been incorrect.

We of course have held that a "judicial admission is binding" when a party "clearly and expressly conceded [an issue] on appeal, both in briefing and at oral argument." *United States v. Crawford*, 372 F.3d 1048, 1055 (9th Cir. 2004) (en banc). And as the majority opinion properly notes, an unambiguous concession at oral argument can be binding. Maj. op. at 18. But the majority opinion improperly extends that principle to a statement at oral argument that starts with the equivocal phrase "I think," on a topic different from the topic of the question posed, on a matter that was litigated extensively before the trial court, and as to which the purported concession later was renounced in a supplemental brief. *See Jonibach Mgmt. Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 n.2 (5th Cir. 2014) ("To qualify as a judicial admission, the statement must be . . . deliberate, clear, and unequivocal . . . ." (internal quotation marks omitted)); *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir. 1995) (holding that a judicial admission may be retracted). Not only is there no support for the majority opinion's incredibly strict application of the judicial admissions doctrine, we do ourselves and the litigants a great disservice if lawyers must be constantly wary that a mistaken guess about the content of the factual record, intended to aid the court, will be held against their clients *conclusively*.

I would reverse the bankruptcy court's holding that Simon was not a "creditor" and would remand for further proceedings. Accordingly, I dissent.